IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on briefs November 9, 2011

**DAVID KYLE GILLEY v. STATE OF TENNESSEE**

**Appeal from the Rutherford County Circuit Court**
**No. 64250     Don R. Ash, Judge**

**No. M2010-02447-CCA-R3-PC - Filed October 31, 2012**

After a trial by jury, the petitioner was found guilty of first degree (premeditated) murder, and he was sentenced to life in prison. His conviction was affirmed by this court on direct appeal. The petitioner filed a petition for post-conviction relief, which was denied by the post-conviction court following an evidentiary hearing. On appeal, the petitioner claims that the post-conviction court erred by: (1) ruling that the State did not violate the petitioner's due process right to favorable evidence by failing to provide information related to the testimony of a State witness; (2) ruling that the petitioner did not receive ineffective assistance of counsel at this trial, and (3) denying his request for post-conviction DNA analysis. After carefully reviewing the record and the arguments of the parties, we conclude that the evidence does not preponderate against the post-conviction court's finding that the State in fact provided the petitioner with access to the favorable evidence in question and that the trial court did not err in its conclusion that the petitioner received effective assistance of counsel at trial. We further conclude that the post-conviction court was within its discretion in denying the petitioner's request for additional DNA analysis. Consequently, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, J.J., joined.

Ann C. Short, Robert R. Kurtz, Gianna Maio, Heather G. Parker. Rebecca S. Parsons, and Lindsay N. Graham, of the University of Tennessee College of Law Innocence Clinic, Knoxville, Tennesse (on appeal); John Drake, Murfreesboro, Tennessee (at the post-conviction hearing), for the appellant, David Kyle Gilley.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William C. Whitesell, District Attorney General, for the appellee, State of

Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

The facts of this case were detailed by this court in *State v. Gilley*, 297 S.W.3d 739, 745 (Tenn. Crim. App. 2009), the petitioner's direct appeal. To briefly summarize, in 2006, after a lengthy investigation by a police cold-case unit, the petitioner was charged with and convicted of the murder of his former girlfriend. The juvenile victim's body, clad only in a bra, was found on May 31, 1984, near an old rock quarry. A pair of "Rustler" jeans was found near the victim's head and a pair of women's "Sergio Valente" jeans was found on the victim's body. Investigation by police and medical officers determined that the victim died as a result of having her head smashed by some nearby rocks and that her body had been dragged a short distance from the location of the homicide.

Blood splatter analysis of bloodstains found on the "Rustler" jeans indicated that they had been worn by someone standing in close proximity to victim during the attack. Portions of these jeans tested positive for the presence of spermatozoa, but none was found in the crotch area. The spermatozoa found on the jeans were consistent with the petitioner's blood type, and DNA from both the petitioner and the victim was found on one area of the jeans.

At trial, witnesses testified that the victim worked her scheduled shift at her place of

-2-

employment, Kroger, on the day she went missing. One of the victim's co-workers saw the victim's car in the Kroger's parking lot when the victim's shift began, and that same witness saw that the victim's car was no longer in the parking lot when she showed up for her own shift later in the day, after the victim's shift had ended. When the witness finished her own shift and left to return home, she saw that the victim's car was back in the parking lot – but this time parked in a different location. Analysis conducted on the victim's vehicle by the FBI crime laboratory mineralogy unit during the police investigation in 1984 matched mud found on the side of the victim's car to mud from the road leading to the quarry where the victim's body had been found.

An eyewitness saw a car matching the victim's at an intersection close to the murder site, and on the same side of the road as the quarry, on the afternoon of the murder. This eyewitness testified that she remembered the incident because she waited for an extended period of time for this car to move, but she finally had to proceed around it. The eyewitness told police investigators in 1984 that the driver of this vehicle was a tall, slender-built male with shoulder-length hair. Upon being shown a photographic array, she identified the petitioner as the driver (and sole occupant) of this vehicle.

Another witness testified at the petitioner's trial that she met the petitioner at a keg party later the same year as the murder. She testified that she left the keg party with the

petitioner, who took her to the rock quarry where the victim had been murdered. While they were there, the petitioner asked her if she wanted to end up like the victim. When the witness asked who the victim was, the petitioner told her that she was his ex-girlfriend and that he had killed her. The witness testified that she told no one about the incident for many years afterward because, after she told her family members the story, her father had instructed her to "keep [her] mouth shut." A police officer also testified that after this witness finally relayed this story to him during the cold case investigation, she led him to a spot in the stone quarry that was less than twenty yards from where the victim's body had been found.

In addition to the eyewitness testimony, DNA, and forensic evidence directly tying the petitioner to the murder scene and the evidence concerning the petitioner's third-party confession, the State also presented considerable circumstantial evidence that the petitioner was the perpetrator. Family members and friends of the victim testified that the petitioner was cold and emotionless in the days and weeks following the victim's death. They testified that on the day immediately following the murder, the petitioner went over to the victim's home in the company of someone seeking to comfort the family. Instead of consoling the victim's mother, however, the petitioner went to the victim's bedroom, removed some letters he had written to the victim,[1] and left. After leaving, he went to a party, where he propositioned one of the victim's friends. This friend testified that after she refused the

---

[1] A different witness testified that the petitioner had previously written letters to the victim in which he had threatened her and warned her that if he could not have her, then no one would.

-4-

petitioner's advances, the petitioner told her that the victim had been cheating on him and deserved what she got.

Police officers who interviewed the petitioner, both immediately following the crime and during the cold case investigation, testified to the petitioner's inconsistent statements and unusual behavior during the interviews. The petitioner initially told police detectives that he had seen the victim the night before the murder at the victim's grandmother's house and that they briefly left the residence to have sex. He also told them that afterward, he worked a night shift before falling asleep at his house and waking at a point in the afternoon that was too late for him to have committed the crime. At an interview with a TBI agent later that same year, the petitioner added that after he had sex with the victim the night before the murder, he and the victim had cleaned themselves up using a pair of jeans. Later in that same interview, when the TBI agent asked the petitioner a question implying that the victim might have seen another man later that night, the petitioner "jumped out of his chair visibly agitated." A police officer who interviewed the petitioner in May of 2000 testified that the petitioner claimed to him that he had not had sex with the victim within two or three days of her death.

The State also presented circumstantial evidence intended to establish the petitioner's motive, identity, and intent. Numerous witnesses testified that the victim was seeing other

-5-

men while she was seeing the petitioner, that the petitioner periodically became aware of this fact, and that the petitioner acted violently toward the victim during his resulting fits of jealously. Moreover, six separate witnesses testified concerning five separate major (and numerous minor) episodes of violence that they had witnessed involving the petitioner and the victim. The witness' testimony concerning all five episodes was remarkably similar. According to these six witnesses, each episode followed a similar arc – it would begin with the petitioner and the victim arguing, and as it continued the petitioner would begin yelling, screaming, and sometimes cursing at the victim. Then the petitioner would generally escalate the situation by resorting to physical violence. More specifically, he would usually grab the victim's head and drag or pull her around by her hair. These episodes almost always culminated with the petitioner committing a far more serious physical assault, one which either injured the victim or endangered her life.

For example, one witness testified concerning an episode that occurred in the parking lot of a movie theater. This witness testified that he saw the petitioner arguing with the victim while the victim was standing outside of the petitioner's car. According to this witness, at one point the victim reached inside of the petitioner's car. The petitioner responded by rolling up his car window on the victim's arm. He then drove off, dragging the victim by her arm alongside of his vehicle into the street. Eventually the victim's arm "popped" out, sending her sprawling onto the road.

Another two witnesses testified that the petitioner grabbed the victim by her hair while they were arguing at a local hangout known as the "party tree," and then smashed her head against a car window. One of these two witnesses also testified that, on a different occasion, she saw the petitioner smash the victim's head into a locker at their school. Yet another witness testified that the petitioner jerked the victim around by her hair following an argument at a school dance, and did not stop until a "big wad" of her hair had separated from her head and remained in his hands. A fifth witness, who was unavailable at the petitioner's trial, gave prior sworn testimony that she had once seen the petitioner grab the victim by both arms and twist them inwards while pulling her towards him after the two had a loud argument.

The sixth witness, Ms. Mary Hunter Brown, testified that in 1984 she was a college residential advisor in the victim's dormitory. She testified that approximately two months prior to the murder, the petitioner visited the victim and the two had a loud argument. She went to the door of the victim's room to investigate, and found the victim with a bloody nose and a whelp on her right check. She testified that shortly afterward she heard the petitioner call the victim a "two-timing bitch" before grabbing her by the hair and pulling her down the hallway to the third floor stairwell. There, he dangled the victim over the edge and threatened to kill her.

In addition to these witnesses, several other witnesses also testified that, in the year before the murder, they saw the petitioner and the victim argue, saw the petitioner accuse the victim of cheating, saw injuries on the victim's body, and heard the victim express that she was afraid of the petitioner. After the State closed its case, the petitioner's brother testified on his behalf as an alibi witness, another of the petitioner's ex-girlfriends testified that the victim had threatened her on a prior occasion and that she had never seen the petitioner start an argument with the victim, and a forensic scientist testified that the "Rustler" jeans found by police at the crime scene could fit on a woman.

Ultimately, the jury found the petitioner guilty, and he was sentenced to life in prison. The petitioner appealed, claiming unreasonable delay in his prosecution, challenging the sufficiency of the evidence used to convict him, asserting the trial court had improperly admitted character evidence that was prohibited by Tennessee Rule of Evidence 404(b), and raising numerous additional claims. On August 13, 2008, this court affirmed the petitioner's conviction, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal soon thereafter. *See id.* The petitioner filed a timely *pro se* petition for post-conviction relief on February 5, 2010, and the post-conviction court, finding a colorable claim, appointed counsel. At a hearing concerning the petitioner's post-conviction petition on September 27, 2010, the following evidence was presented:

The first witness for the petitioner was the petitioner's lead trial counsel. The petitioner's lead trial counsel testified that defending the petitioner was challenging because of the eighteen year span of time between the victim's murder and the petitioner's prosecution. He testified that his entire law firm assisted in the petitioner's defense and that he also employed an investigative agency on the petitioner's behalf, an organization that was run by a retired FBI agent. The witness testified that agency investigators attempted to perform background checks on all of the witnesses on the prosecution's witness list.

The petitioner's lead trial counsel testified that prior to trial the prosecution gave him access to documents concerning the petitioner's case, and he was given "open file discovery" at various stages. He testified that he was given access to all of the physical evidence, most of the photographs, and a "good number" of witness statements – but not all of them – during discovery. The witness testified that he filed a pre-trial motion to compel discovery and that this motion specifically requested *Brady* material.

The petitioner's lead trial counsel testified that in his opinion character witnesses were a major component of State's proof at the petitioner's trial, and in his opinion this evidence was convincing to the jury. He testified that the prosecution gave him the names of some, but not all, of these character witnesses prior to trial, and his investigators attempted to interview them but were unsuccessful because the addresses they had been given were old.

The witness testified that prior to trial he became aware of a college police report concerning an incident involving the petitioner that had been filed at the victim's college campus back in 1984. The witness testified that he learned of this report when one of the prosecution's prospective character witnesses, Ms. Kim Roberts, testified concerning the incident at a pretrial hearing. The witness testified that he had reviewed this police report prior to trial and that he recognized the name "Mary Hunter" from that report.

Nonetheless, the witness testified that he was unaware that Ms. Mary Hunter Brown (the individual who reported the incident) was a potential witness at trial. The witness explained that he did not realize that Ms. Mary Brown and Ms. Mary Hunter were the same individual (who had been married in the intervening years) until Ms. Mary Hunter Brown took the stand at the petitioner's trial. He testified that he had made some efforts to locate "Ms. Mary Hunter" prior to trial, but he was unsuccessful. He testified that during the petitioner's trial, he also attempted to locate and interview the former college security guard who made the report, but he could not find him.

The petitioner's lead trial counsel testified that Ms. Mary Hunter Brown's testimony concerning the incident that occurred at the victim's college dormitory differed significantly from the testimony concerning that same incident that had been given by Ms. Kim Roberts. The witness testified that Ms. Mary Hunter Brown testified that the petitioner had hung the

victim over a stairwell railing during the assault, but prior to trial no one had testified that he had done so. This detail was also not included in the campus police report concerning the incident.

After giving this testimony, the witness was shown a document containing a police officer's handwritten notes from a pre-trial interview with Ms. Mary Hunter Brown. The witness testified that to his knowledge this document was not provided to him during discovery, and he could not recall ever seeing it before.

The petitioner's lead trial counsel also testified that he was aware that the petitioner had informed police investigators back in 1984 that he had consensual sex with the victim the evening before her murder, and he used a pair of jeans that he found in the backseat of the victim's car to wipe himself off afterward. The witness testified that DNA results on a stain found on a portion of the "Rustler" jeans that were recovered from the crime scene revealed a mixture of the victim's and the petitioner's DNA. He further testified that these results were consistent with the statement that the petitioner had given authorities back in 1984.

The petitioner's lead trial counsel testified that prior to trial, he specifically considered requesting that the crotch of the "Rustler" jeans be tested for DNA, but he decided against

making such a request. The witness explained that he was not sure what the results of any such test would have been, and "if it had shown that it was [the petitioner's] DNA it would have killed our case." The witness testified that if another person's DNA had been found on the inside of the jeans, it might have significantly undercut the prosecution's case.

On cross-examination, the petitioner's lead trial counsel testified that he had asked the petitioner if the "Rustler" jeans belonged to him, and the petitioner had denied ownership. The witness testified that the petitioner had told him that he had simply found the "Rustler" jeans in the back of the victim's car. The witness testified that the petitioner claimed that he had never asked the victim to whom the "Rustler" jeans belonged. He also testified that he had DNA experts assisting him with the petitioner's defense, that these experts examined the "Rustler" jeans at issue, and that they could have performed DNA testing on the crotch of those jeans if he had requested it.

The petitioner's lead trial counsel also testified on cross-examination that he had received a copy of the college police report concerning the 1984 incident involving the petitioner and the victim during the discovery process. He testified that he was aware that "Ms. Mary Hunter" would be called as a witness at trial. He testified that the day before "Ms. Mary Hunter" was scheduled to testify, one of the prosecutors mentioned the name "Ms. Mary Brown" to him. The witness testified that he objected to the testimony of Ms.

-12-

Mary Hunter Brown at trial on the basis that he was unaware of who she was and was unaware that she would be called as a witness, as well as on numerous other grounds.

The next witness for the petitioner was Mr. Brett Bonham, the former college security guard who had filed the incident report of the domestic incident involving the petitioner and victim back in 1984. Mr. Bonham testified that prior to the incident he was fully trained in the proper process for filling out incident reports. When asked about his memory of the incident involving the petitioner, the witness testified that "I do not remember the incident at all" because it "was 26 years ago." He testified that he also did not remember filling out the incident report. After being shown a copy of that report, he testified that he recognized his name on it.

Mr. Bohnam testified that, generally speaking, prior to making a report he would interview witnesses and take notes. He testified that he no longer possessed any such material concerning this incident. He testified that it was his general practice to include relevant details in his reports. He testified that if anyone had given him information during his investigation that the petitioner had threatened to kill the victim and had held her out over a railing, he would have included it in his report, and "probably would have relayed it to other officials."

Mr. Bonham testified that he was never contacted by either the defense or the prosecution concerning this case until a few weeks prior to his testimony. He testified that he ceased his employment at the college near the time of the murder. He testified that he presently lived in Beech Grove, Coffee County, and had lived there for the last two years. He testified that prior to that time he had lived virtually his entire life in Murfreesboro, Rutherford County. He testified that his telephone number was available in the phone book. On cross-examination, the Mr. Bonham reiterated that he had no independent recollection of investigating the incident detailed in the police report.

The next witness for the petitioner was Mr. James Gage, who testified that he was employed with the Rutherford County Sheriff's Office in 1984. He testified that he was the lead investigator assigned to the victim's cold case as of July 1990. He testified that at that time there were two main suspects in the case, the petitioner and another individual. He testified that the second individual was considered a suspect because a hair discovered in the victim's vehicle was a "one in five thousand" match to him.

Mr. Gage testified that during his investigation he had wanted to send a blood sample from this second suspect to a laboratory for DNA testing, but he was told by the District Attorney's Office not to do so because "the defendant [wa]s the one who did the rape." Mr. Gage testified that throughout the time he was working on the case, he did not believe that

-14-

he had probable cause to arrest the petitioner. On cross-examination, Mr. Gage clarified that he was not involved in the initial investigation into the victim's murder that occurred back in 1984. He testified that he spent roughly six weeks in all working on the cold case and that during this time he also worked on other matters.

The fourth witness was Detective Daniel Goodwin of the Rutherford County Sheriff's Office. Mr. Goodwin testified that he had been employed there for eighteen years, and he first became involved in the victim's murder investigation on February 1, 2000. He testified that his involvement began when he was informed that the office had received a call from someone with new information about the case. This information pointed at a third suspect who was not the petitioner. Detective Goodwin testified that this third suspect was deceased, so he collected DNA samples from the suspect's relatives. Mr. Goodwin testified that the third suspect was eliminated as the perpetrator after the DNA testing.

Detective Goodwin also testified that he knew the victim when she was still alive, and he had gone on a date with her four days before her murder. He testified that he submitted a DNA sample during the ensuing investigation.

Detective Goodwin testified that he was familiar with the DNA results of the stain found on the right leg of the "Rustler" jeans. Detective Goodwin testified that experts had

told him that this stain was not consistent with someone having used the jeans to wipe themselves off after sex, but rather that "[i]t was consistent with someone directly ejaculating onto the pants."

Detective Goodwin testified that he remembered that Ms. Mary Hunter Brown was a witness at the petitioner's trial. He testified that she had subsequently died. He testified that in the summer of 2006, in preparation for the petitioner's trial, he had interviewed Ms. Mary Hunter Brown. He testified that this interview was not recorded or videotaped. He testified that it was his belief that police had given everything concerning the case, including his notes from this interview, to the defense through the prosecutor's office.

On cross-examination, Detective Goodwin testified that he also investigated the second suspect in the murder, who was the only other individual besides the petitioner who was considered a suspect during the time that Detective Gage had worked on the case. He testified that despite investigating this second suspect, he was never able to find any connection to the victim, and there was no proof that this second suspect had ever been in physical contact with the victim.

Detective Goodwin also testified that he was involved in the discovery process in advance of the petitioner's trial. He testified that he gave copies of all the evidence and

materials available to him to the prosecutor's office for purposes of disclosing them to the defense. He also testified that he was present on several occasions and witnessed the petitioner's legal team reviewing evidence and materials from the case in the District Attorney's Office. He testified that they were shown all of the evidence and given free reign over the file at those times.

Detective Goodwin testified that he thought that he might have taken a formal written statement from Ms. Mary Hunter Brown, but he was never been able to locate any such statement. Detective Goodwin testified that prior to the petitioner's trial there was a pretrial hearing at which eighteen witnesses testified concerning the petitioner's extensive past history of violence. Detective Goodwin testified that the petitioner's trial judge made individual decisions following that hearing concerning who would and who would not be permitted to testify. He testified that the petitioner appealed the trial court's pretrial ruling all the way to the Tennessee Supreme Court.

The next witness was Detective William Sharp of the Rutherford County Sheriff's Office. Detective Sharp testified that he was assigned the victim's cold case in February of 2000. He testified that at some point during his investigation he located Ms. Mary Hunter Brown, after getting her name from an incident report that was filed at the victim's college on March 1, 1984. He testified that he spoke with Ms. Mary Hunter Brown on June 19,

2006. Detective Sharp testified that the college incident report did not include any allegation that the petitioner had threatened to kill the victim or had hung her over the railing of the stairwell. He testified that he first learned of these details when he interviewed the witness at her place of business on June 21, 2006. He testified that he could not recall whether the witness had claimed to him that she had given these particular details concerning the incident to any other law enforcement officer prior to that time. He testified that he believed he had typed up a formal statement of his interview with the witness, but he had been unable to locate any such written statement despite searching for it.

Detective Sharp testified that all information concerning the victim's murder was turned over to the District Attorney's Office for the purpose of disclosure to the defense. Detective Sharp testified that he sent the "Rustler" jeans to a laboratory for DNA testing prior to the petitioner's trial. He testified that he believed that the inside crotch of the "Rustler" jeans was tested for DNA evidence at that time, but he could not say for certain.

On cross-examination, Detective Sharp testified that he did not take a formal statement from every witness in the case, and he was not sure whether he had ever taken a formal statement from Ms. Mary Hunter Brown. He testified that it was possible that no written report of her interview had ever existed. He testified that his handwritten notes of his interview with her included references to the petitioner assaulting the victim, giving her

-18-

a bloody nose, pulling her hair, and holding her over a third floor railing. He testified that his handwritten notes were given to the prosecutor's office, and he believed that they had been turned over to the defense. He also testified that he was aware that the college incident report concerning this incident had been given to the defense and that it referenced the petitioner's having physically assaulted the victim and made some reference to stairs.

Detective Sharp testified that the defense requested for him to locate the officer who had filled out the college incident report. He testified that he investigated and gave the defense the name and address that he found for that officer. He testified that to his knowledge there was nothing in the case that was not turned over to the defense.

The final witness at the post-conviction hearing was Ms. Patti Choatie. Ms. Choatie testified that she was employed by the Tennessee Bureau of Investigation ("TBI") Crime Laboratory in Nashville, Tennessee. She testified that she first became involved with the victim's homicide investigation in 1984 as a serologist. She testified that she made herself available to the defense prior to trial and was interviewed on several occasions.

Ms. Choatie testified that in 1984 she tested the "Rustler" jeans in connection with the homicide. She testified that during her initial investigation she tested "every square inch" of the "Rustler" jeans for the presence of semen and vaginal fluid using an "AP overspray"

test. She testified that no semen or vaginal fluid was found on the inside crotch of the "Rustler" jeans, but the jeans did test positive for semen in eight other areas. She testified that in 1984 serology testing required large samples in order to produce good results and that testing destroyed the sample. Consequently, none of the areas of the jeans where semen had been found still existed. She testified that none of the samples she tested was inconsistent with the petitioner's blood type.

On cross-examination, Ms. Choatie testified that she had never seen an instance in her career where the "AP overspray" test that she had performed on the "Rustler" jeans had failed to detect any semen that was present. She also testified that "AP overspray" testing would not indicate the presence of hair, blood, saliva, or skin cells. She testified that because the crotch of the jeans did not test positive for the presence of semen, she never performed any serology testing on the crotch of the "Rustler" jeans, and consequently the crotch of those jeans was still intact.

On re-direct examination, Ms. Choatie testified that the TBI team working on the case had physically examined the "Rustler" jeans and had tested anything that resembled potential blood. The witness also testified that trace DNA could be transferred to the jeans by any person who had any contact with them. She stated that, for example, she was relatively certain that her DNA could be found on the jeans because she had handled them. She

testified that because so many people had handled the jeans, the discovery of skin cells on the inside crotch of those jeans would be of little or no exculpatory value.

After taking this testimony, the post-conviction court heard arguments from the parties and took the issue under consideration. On October 15, 2010, the post-conviction court issued an order denying the petition for post-conviction relief. The petitioner filed a timely notice of appeal of three separate issues, which we now proceed to address.

## ANALYSIS

Tennessee's Post-Conviction Procedure Act provides an avenue of judicial relief "when [a] conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (Supp. 2011). When seeking post-conviction relief, a petitioner must prove any factual allegations made by clear and convincing evidence. *See, e.g., Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011). The factual findings made by a post-conviction court are binding on appeal, unless the record evidence preponderates against them. *See Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)*; Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009). Legal conclusions made by the post-conviction court are reviewed *de novo* with no presumption of correctness. *See Calvert*, 342 S.W.3d at 485.

The petitioner raises three challenges to the post-conviction court's order denying his petition. The petitioner's first claim is that the post-conviction court erred in finding as a factual matter that the State did not withhold valuable impeachment evidence concerning the testimony of Ms. Mary Hunter Brown. However, we conclude that the evidence does not preponderate against the post-conviction court's finding. Next, the petitioner claims that the trial court erred by ruling that his trial counsel was not rendered constitutionally ineffective by virtue of being inadequately prepared for cross-examination of that same witness. However, the petitioner cannot establish any prejudice stemming from any constitutional deficiency in this regard. Finally, the petitioner claims that the post-conviction court erred by denying his request to have DNA testing performed on the inside of the crotch of the "Rustler" jeans, which he claims might help prove that the jeans had been worn by, or actually belonged to, someone else. However, the crotch of the jeans at issue was previously tested for the presence of semen, and none was found. The discovery of the presence of any other form of third-party DNA (*i.e.* hair, saliva, or skin cells) in the crotch of the jeans at issue at the present time would not help exonerate the petitioner by rendering it appreciably more likely that the jeans at issue might have belonged to or been worn by someone else back in 1984. Consequently, we affirm the judgment of the post-conviction court.

**I.**

The petitioner claims that the post-conviction court erred by denying his claim that the State failed to provide favorable information in violation of the *Brady v. Maryland*, 373 U.S. 83 (1963), and the Fourteenth Amendment to the United States Constitution, because the State failed to provide information relating to the testimony of Ms. Mary Hunter Brown. Specifically, the petitioner complains that the State failed to turn over notes taken by a detective during an interview with Ms. Mary Hunter Brown. However, the post-conviction court found as a factual matter that the State did in fact provide the petitioner with access to the evidence at issue, and the record evidence does not preponderate against the post-conviction court's finding.

"The Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness.'" *State v. Ostein*, 293 S.W.3d 519, 535 (Tenn. 2009) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). "[T]his standard of fairness requires that criminal defendants 'be afforded a meaningful opportunity to present a complete defense.'" *Id.* One component of a defendant's right to present a complete defense is "'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). This body of law requires the prosecution to voluntarily disclose exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *E.g., United States v. Agurs*, 427 U.S. 97, 110-12 (1976). In addition, by

longstanding rule of law, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Well-known colloquially as the *Brady* rule, the due process requirement that the State surrender evidence favorable to the defense upon request extends not only to exculpatory evidence, but also to evidence that is relevant to the impeachment of State witnesses when the "reliability of [the] witness may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also Johnson v. State*, 38 S.W.3d 52, 57 (Tenn. 2001). In order to obtain relief on *Brady* violation grounds, a defendant must show that: (1) the defendant requested the evidence at issue, (2) the evidence was in the State's possession and was suppressed, (3) the evidence at issue was favorable, and (4) the evidence was material. *State v. Evans*, 838 S.W.2d 185, 196 (Tenn. 1992). Evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995) (quoting *Kyles v. Whitley*, 519 U.S. 419, 434 (1995)).

The petitioner claims that the State violated his *Brady* rights by failing to turn over handwritten notes taken by Detective Sharp in June 2006 during an interview with Ms. Mary Hunter Brown. In these notes, Detective Sharp indicated that he and another detective had

met with the witness and she had told them that in 1984 she had seen the petitioner attack the victim by pulling her hair and holding her over the railing of a stairwell in her dormitory. The petitioner claims that the State had these notes and failed to disclose them in response to *Brady* requests, and furthermore that possession of these notes would have put him on notice that Ms. Hunter Brown's testimony at trial would be "materially different" from her prior interview with Detective Sharp and from the account given in a report concerning the incident that was filed by a university security officer shortly following the incident, in which there is no discussion of the petitioner's having held the victim out over the stairwell. In addition, the petitioner complains that although police detectives testified that they believed that Ms. Mary Hunter Brown had executed a formal written statement in conjunction with this interview, no such statement was ever located or provided to the defense. However, after reviewing the record, it is evident that the petitioner failed to demonstrate by clear and convincing evidence that any of this evidence was actually suppressed by the State. In addition, the petitioner cannot make the necessary showing of materiality.

With respect to the issue of suppression by the State, the post-conviction court found that the State had, in fact, provided the petitioner with the notes and information at issue. This finding is conclusive on appeal unless the record evidence preponderates against it. *See Grindstaff,* 297 S.W.3d at 216. The record evidence, however, supports the post-conviction court's finding.

-25-

At the petitioner's post-conviction hearing there was relatively little testimony concerning the allegedly suppressed evidence. On the petitioner's side, his former trial counsel testified that he did not remember ever seeing Detective Sharpe's handwritten notes concerning Ms. Mary Hunter Brown's interview. However, he did not testify that he was certain that those notes had never been disclosed. He also testified that he was given "open file discovery" concerning the petitioner's case at various times. While he testified that he was given most – but not all – of the witness' statements, he never specifically testified that a formal written statement concerning Ms. Mary Hunter Brown's interview existed or that he was certain it had not been disclosed to him.

On the State's side, two detectives testified that they gave all of their material concerning the interview to the prosecutor's office for disclosure to the defense and that they had no knowledge that any information was not disclosed. One detective testified that he witnessed the defense team being given, and taking advantage of, "open file disclosure" in the prosecutor's office. Both officers testified that they were not sure whether a formal written statement had ever been prepared with respect to Ms. Mary Hunter Brown's testimony.

Consequently, neither side presented evidence that established one way or another whether any formal written statement of Ms. Mary Hunter Brown's testimony existed or

whether the detective's handwritten notes concerning that same interview were disclosed by the State. It was the petitioner's duty to support any factual allegations made in his post-conviction petition by clear and convincing evidence. *See, e.g.,Calvert*, 342 S.W.3d at 485. The evidence in the record does not preponderate against the post-conviction court's finding that the petitioner failed to meet this burden, and the post-conviction court was free to find that the State in fact disclosed this information during the "open file discovery" that multiple witnesses' testified was afforded to the defense on several occasions.

Moreover, the petitioner cannot show that this evidence relating to Ms. Hunter Brown's testimony was material; it appears that the outcome of the petitioner's trial would have remained the same whether or not the defense had actually used this information to impeach Ms. Hunter Brown's testimony. Ms. Hunter Brown was but one of six separate witnesses who testified concerning serious prior assaults that the petitioner committed against the victim. Even had she been thoroughly discredited by the defense during cross-examination, virtually identical testimony from five other witnesses would remain.

Although the petitioner attempts to elevate the importance of Ms. Hunter Brown's testimony in relation to these other five witnesses – at one point even referring to her testimony as a "pillar of the State's case" – on the grounds that the particular violent incident she described in her testimony "was the closest in time to the victim's murder and was more

violent than any other incident described at trial," this reasoning does not stand up to scrutiny. With respect to the timing of the incident, almost all of the major violent episodes described by the six trial witnesses happened within a year of the victim's murder. While the specific incident described by Ms. Hunter Brown – which happened approximately two months before the victim's murder – might have been proximately the closest in time to the victim's demise, there was considerable testimony that the petitioner committed violent assaults against the victim frequently (and without any significant temporal break) during the preceding months. Even had Ms. Hunter Brown never testified, testimony from numerous other witnesses to the effect that the petitioner was jealous of the victim and acted violently upon his jealous feelings in the months leading up the victim's murder would still remain.

Nor was the specific incident described by Ms. Hunter Brown significantly "more violent" than any of the other episodes. As we have discussed, numerous witnesses testified that the petitioner attacked the victim by grabbing her and dragging or whipping her around by her hair, as Ms. Hunter Brown testified occurred in the dormitory attack. And while the act of dangling someone off the edge of a third floor stairwell, as Ms. Hunter-Brown testified, is certainly violent, we are unwilling to say that it is significantly more violent than the act dragging someone by the arm alongside a moving car or smashing her head into a car window.

The petitioner also urges that Ms. Hunter Brown's statement should be considered material because, he asserts, the majority of the prosecution's case against him was circumstantial. However, this argument ignores the fact that the State presented considerable direct evidence tying the petitioner to the crime scene, including DNA evidence, forensic evidence, and eyewitness testimony. Moreover, the State presented evidence that the petitioner confessed to committing the crime to a third party. Furthermore, even if the State's case against the petitioner *had* been entirely circumstantial, we are unwilling to conclude from this fact that evidence that would otherwise be deemed immaterial should be accorded additional importance. The Tennessee Supreme Court recently abolished traditional legal distinctions that treated circumstantial evidence with more suspicion and placed it on a lesser footing than direct evidence, and is now treating both types of evidence equally. *See State v. Dorantes*, 331 S.W.3d 370, 380 (Tenn. 2011). It would be inconsistent with this treatment to accord evidence a higher degree of materiality in cases in which the State's remaining case against the petitioner is entirely circumstantial.

The petitioner has failed to demonstrate that the post-conviction court's finding that the State in fact disclosed the *Brady* material at issue is against the preponderance of the evidence. Moreover, he cannot show that the information at issue was material. Consequently, the petitioner's claim that the post-conviction court erred when it denied his *Brady* claim is denied.

-29-

## II.

The petitioner claims that the post-conviction court erred by denying his claim that his trial counsel rendered ineffective assistance by: (1) failing to properly prepare for Ms. Mary Hunter Brown's cross-examination, and (2) failing to locate and call as a rebuttal witness the campus security officer who filed the initial incident report concerning the petitioner's dormitory assault on the victim. We disagree.

Criminal defendants have the right to representation by counsel, a right guaranteed by both our federal and state constitutions. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); TENN. CONST. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel."). "Inherent in the constitutional right to counsel is the right to effective assistance of counsel." *Smith v. State*, 357 S.W.3d 322, 336 (Tenn. 2011). "The benchmark for judging any claim of ineffectiveness must be whether [the petitioner's] counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To prove ineffective assistance of counsel, a petitioner must show by clear and convincing evidence both: (1) a deficient performance trial counsel, and (2) that the defense was prejudiced by that deficient performance. *Strickland*, 466 U.S. at 686; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). To establish deficient performance, a petitioner must show that his counsel's acts or omissions fell below an objective standard of reasonableness in light of prevailing professional norms. *See Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). When reviewing an ineffective assistance of counsel claim, courts will not grant the petitioner the benefit of hindsight, second-guess his counsel's reasonably-based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). To demonstrate prejudice, a petitioner must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Fields v. State*, 40 S.W.3d 450 (Tenn. 2001). A trial court's factual findings concerning counsel's performance are entitled to a presumption of correctness, "which is overcome only

when the preponderance of the evidence is contrary to the trial court's findings. . . ." *Fields*, 40 S.W.3d at 456. A post-conviction court's application of law to those facts is reviewed under a pure *de novo* standard. *Fields*, 40 S.W.3d at 456; *Burns*, 6 S.W.3d at 457.

After reviewing the record in this matter, we conclude that the petitioner cannot establish any prejudice stemming from either of his counsel's alleged shortcomings. Ms. Hunter Brown's testimony was essentially redundant with that of five other witnesses at the petitioner's trial, who also testified concerning the petitioner's jealous behavior toward the victim and his past history of physically assaulting her. The particular incident described by Ms. Hunter Brown was not significantly more recent, more violent, or otherwise distinguishable in any meaningful way from the other four major episodes that were attested to by these other five witnesses. Consequently, even if the petitioner could establish that his trial counsel had engaged in any deficient performance with respect to his preparation for her cross-examination or his failure to secure the former security officer as a rebuttal witness (an issue which we do not reach), he cannot establish a reasonable probability that but-for these errors, the outcome of the trial would have been different. Consequently, the petitioner's claim that the post-conviction court erred by denying his ineffective assistance of counsel claim is denied.

**III.**

The petitioner claims that the post-conviction court erred by denying his request for further DNA analysis of the "Rustler" jeans that were found at the crime scene and introduced into evidence at his trial. Petitioners who are convicted of certain serious crimes possess the statutory right to request post-conviction DNA testing under certain circumstances. *See* T.C.A. § 40-30-303 ("[A] person convicted of and sentenced for the commission of [enumerated offenses], may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution . . . that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence."). Any such petition is reviewed under the standards contained in section 40-30-304, which provides:

> After notice to the prosecution and an opportunity to respond, [a] court shall order DNA analysis if it finds that:
>
> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304.[2]  "While . . . all four criteria must be established before DNA testing is required under section 40-30-304, the most important one for purposes of this case is the first: whether '[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis.'" *Powers v. State*, 343 S.W.3d 36, 48-49 (Tenn. 2011) (quoting T.C.A. § 40-30-304(1)).  "The definition of 'reasonable probability' has been well-established . . . and is traditionally articulated as 'a probability sufficient to undermine confidence in the outcome.'" *Id.* at 49 (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (internal quotations omitted)).  In conducting this inquiry, courts should "begin with the proposition that DNA analysis will prove to be exculpatory," *id.* at 55, and "postulate whatever realistically possible test results would be most favorable to the defendant." *Id* (internal quotations omitted). "While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." *Id.* at 51.  "[T]he analysis must focus on the strength of the DNA evidence as compared to the evidence presented at trial — that is, the way in which the particular evidence of innocence interacts with the evidence of guilt." *Id.* (internal quotation omitted).

---

[2]  Section 40-30-305 affords a post-conviction court the discretion to order post-conviction DNA testing under a slightly more permissive standard. *See* T.C.A. §40-35-305(1).  The post-conviction court noted that the petitioner "did not allege the Code section in which he was seeking DNA testing; however, the petitioner did not meet the requisite standard for [either section]."  In his brief on appeal, the petitioner only discusses his entitlement to mandatory testing under Section 304.  We agree with the post-conviction court that the petitioner has not established his entitlement to relief under either standard.

The petitioner's claim hinges on his assertion that DNA analysis of the inside of the crotch of the "Rustler" jeans will not reveal the presence of any of his own genetic material and will reveal genetic material belonging to an unknown donor. Experts testifying for the State at trial concluded that the jeans were worn by someone in close proximity to the victim at the time of her death. The petitioner asserts that if another individual's DNA were to be found on the inside of the crotch of the "Rustler" jeans, these results would be inconsistent with the State's theory of the case and consistent with his explanation – that his DNA was found elsewhere on those "Rustler" jeans because he used them to wipe himself off after having sex with the victim the night before she was killed.

The post-conviction court held that the petitioner failed to establish that any favorable results would create a reasonable probability that he would not have been charged with or convicted of the victim's murder, explaining that "[t]here was sufficient evidence presented at trial to convict the [petitioner] of the crime charged even if other DNA was present." While the post-conviction court's precise grounds for reaching this conclusion are not detailed, it is nonetheless supported by the record. In order for any court-ordered DNA analysis of the "Rustler" jeans to have any significant exculpatory value, any DNA material found on the crotch of the "Rustler" jeans would need to be found in the form of semen, sperm, or vaginal secretions. Discovering another individual's personal secretions on the inside crotch of the "Rustler" jeans would lead to a strong inference that someone else had

worn those jeans prior to the victim's murder, as it would be difficult to supply any other reasonable explanation for the presence of any such material in that location. However, the record reflects that the crotch of the "Rustler" jeans at issue has been previously tested for the presence of both semen and vaginal fluid, and those tests came back negative. Consequently, it has already been established that there are no personal secretions from any other individual located on the inside of the crotch of the "Rustler" jeans.

The petitioner acknowledges this point, but asserts that the jeans should still be tested for "other sources of DNA" including "hair, saliva, blood, or skins cells." However, the discovery today of someone else's DNA in the form of hair, saliva, or skin cells on the inside of the "Rustler" jeans would not lead to a reasonable inference that they had been worn by someone else back in 1984. The record reflects that the "Rustler" jeans at issue have been examined numerous times by various investigators and experts, used as an exhibit at trial, and transported and placed into and out of storage on numerous occasions over the last twenty-six years. Regardless of the degree of care that was taken during the collection, processing, and transport of this particular piece of evidence, it seems fairly certain that some amount of third-party DNA in the form of skin, saliva, or hair cells will necessarily have been transferred to various locations on the jeans over the years, including the inside crotch. While it would seem far less likely that blood evidence from a third party might have been randomly transmitted to that specific location, blood evidence would only tend to exclude the

petitioner as the owner of the jeans if it was accompanied by vaginal secretions – which the record reflects have already been tested for and determined not to be present. Moreover, the record reflects that the "Rustler" jeans have been thoroughly examined in the past by experts and detectives in search of anything remotely resembling blood evidence, and none has ever been found in that location. For these reasons, the petitioner has failed to provide any plausible theory under which favorable DNA results would reduce the likelihood that he would have been tried for or convicted of the victim's murder.

Furthermore, we do not dispute the post-conviction court's conclusion that even if another individual's DNA were to have been found on the inside crotch of the "Rustler" jeans, it is not reasonably likely that the State would have dropped the case or that the jury would have declined to convict the petitioner. The petitioner concedes that his DNA was found on the outside of the "Rustler" jeans. While he has previously attempted to explain away this DNA by claiming to have wiped himself off on those jeans after having sex with the victim on the night before her murder, the record reflects that he made statements to the contrary during at least one interview with police. Given these inconsistent statements, it seems to us that both the prosecutor and the jury would have likely rejected his explanation for the presence of his DNA on the "Rustler" jeans as entirely too convenient in light of the remaining available evidence. As we have summarized, the State's case against the petitioner included eyewitness testimony, forensic evidence, DNA evidence, a third party

confession, and numerous witnesses who testified concerning the petitioner's past history of violent intentions toward the victim. While the petitioner's extremely capable post-conviction representation has ably attempted to attack the credibility of – and cast doubt upon the testimony of – each of these witnesses, at the end of the day, the jury resolved these credibility issues against the petitioner. There is nothing about the particular testing that he has requested that would appear reasonably likely to have altered this outcome even if favorable DNA results were obtained.

After carefully reviewing the record, we conclude that the post-conviction court properly considered all of the evidence and that this evidence supports the post-conviction court's conclusion that the petitioner failed to establish a reasonable probability that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis. Accordingly, the post-conviction court did not err by denying the petitioner's request for such DNA analysis.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____

JOHN EVERETT WILLIAMS, JUDGE